In the

# United States Court of Appeals
### For the Seventh Circuit

———————————

No. 20-2641

ERIC HODKIEWICZ,

*Petitioner-Appellant,*

*v.*

CHRIS BUESGEN, Warden,

*Respondent-Appellee.*

———————————

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 18-CV-900 — **Nancy Joseph**, *Magistrate Judge.*

———————————

ARGUED APRIL 15, 2021 — DECIDED MAY 21, 2021

———————————

Before KANNE, ROVNER, and HAMILTON, *Circuit Judges.*

KANNE, *Circuit Judge.* A Wisconsin jury found that Petitioner Eric Hodkiewicz stalked, harassed, and assaulted his wife and convicted him of nine offenses. Hodkiewicz challenged his conviction and sentence in state court, arguing (among other things) that he received ineffective assistance of counsel. The Wisconsin Court of Appeals rejected his argument, and the federal district court then denied habeas relief.

We, like the district court, conclude that the Wisconsin Court of Appeals reasonably determined that Hodkiewicz cannot show prejudice arising from his counsel's alleged errors. We therefore affirm.

## I. BACKGROUND

Eric Hodkiewicz stood trial in March 2014 on nine charges ranging from unlawful use of a telephone to strangulation and suffocation.[1] Trial established the following.

In May 2010, Hodkiewicz's wife, S.P., reported to the police that Hodkiewicz was abusing her. She was eight months pregnant at the time. He denied the allegations but admitted that he had grabbed S.P.'s wrists and pulled her around. S.P. told Hodkiewicz to move out of the house, and Hodkiewicz filed for divorce on May 24. Hodkiewicz returned a few days later and, S.P. claimed, assaulted her in the bathroom. She was admitted to the emergency room for her injuries, while Hodkiewicz denied having any contact with S.P. that day.

On May 28, S.P. gave birth to their son, J. She permitted Hodkiewicz to see J. periodically over the next few months, but when he attempted to visit on August 9, 2010, S.P. said it was not "a good time." Hodkiewicz got "angry and upset."

---

[1] Count 1 alleged stalking; Count 2 alleged unlawful use of a telephone as a domestic abuse repeater; Count 3 alleged disorderly conduct as a domestic abuse repeater; Count 4 alleged criminal damage to property as a domestic abuse repeater; Count 5 alleged burglary of a building or dwelling; Count 6 alleged substantial battery—domestic abuse, as a domestic abuse repeater; Count 7 alleged strangulation and suffocation—domestic abuse, as a domestic abuse repeater; Count 8 alleged disorderly conduct—domestic abuse, as a domestic abuse repeater; and Count 9 alleged bail jumping.

Shortly afterward, S.P. noticed that her above-ground pool had been slashed—and from that point on, her life became the stuff of nightmares. She found a dead rabbit on her doorstep. She found the word "bitch" scratched into her car, and garden shears and meat forks were stabbed into the seats. She discovered antifreeze in her dog's dish and the body of a stray cat hanging from a tree outside her home. Her mailbox was stuffed with another cat (this one alive) and ominous notes bearing messages like "u r dun." A "pretty big pile of animal guts" turned up on her driveway. Her dog went missing and then reappeared forty miles away.

Worse yet, S.P. was attacked while alone in her garage on December 9, 2011. She testified that she was hit on the head from behind and then struck or kicked on the floor. She didn't see her assailant but testified to hearing Hodkiewicz say she was crazy and that she should not have custody of J. Again, she went to the emergency room.

Hodkiewicz denied involvement in any of the above incidents, and little evidence implicated him other than S.P.'s word. In fact, Hodkiewicz had J. the night S.P. was attacked, and his neighbor, Kyle Thorson, testified that he was with Hodkiewicz for part of the evening. Specifically, Thorson testified that he heard Hodkiewicz's garage door open between 7:30 and 8:00 p.m. that night; went over to Hodkiewicz's garage between 8:00 and 8:30 p.m.; and talked with him for about sixty or ninety minutes. Police detective Wade Wudtke testified, however, that when he interviewed Hodkiewicz about his whereabouts on that night, Hodkiewicz made no mention of being with Thorson.

S.P. moved in with her parents in March 2012. Then, over the next few months, S.P. received 146 calls and occasional

harassing text messages from a restricted or unknown number. When S.P. began answering the calls to figure out who was making them, she testified to recognizing Hodkiewicz's voice on the line, making insults—"you're a stupid bitch" and the like. The text messages said such things as, "U need 2 shut ur fat mouth wile u can think ur winning try me bitch."

Police investigator Mark Hendzel testified that the calls and texts were traced to a "TracFone," a prepaid cell phone with unreliable subscriber information often used by those seeking to avoid detection. The phone number used to activate the TracFone belonged to the company that Hodkiewicz worked for. Hodkiewicz again denied involvement and pointed out that he was in temporary custody at the county jail on May 12, 2012—the day the TracFone was activated—and on dates when seventeen calls from it were made. Hendzel testified, though, that "technical support with TracFone" told him that a TracFone could be activated remotely. He also testified that he had "received information" that Hodkiewicz had relatives working at the jail who were suspected of giving him "special privileges," including access to phones.

In July 2012, S.P. moved into a new apartment and continued to field harassing calls and report them to the police. On August 6, she found flowers at her door. She thought they had been misplaced because she had not told anyone where her new apartment was except for her parents and Jed Reinke, the father of her older son. But then she received a phone call on August 10 from someone who asked, "Did you get them?" She didn't respond; the caller laughed and said, "you did." Again, S.P. claimed to recognize Hodkiewicz's voice, but Hodkiewicz denied leaving her flowers or calling her that day. S.P.'s cell-phone records showed that the only calls she

received at the relevant time were from Reinke—but Hendzel testified that S.P. said she received the call on her *work* phone.

The harassment continued: more flowers mysteriously appeared on S.P.'s second-floor balcony, more damage was inflicted on her car. By May 2013, Hodkiewicz was charged with stalking, placed on probation, and told to have no contact with S.P.

But things didn't end there. During the night of July 1–2, 2013, S.P. walked into her bathroom and was suddenly choked from behind with some sort of rubber tube. Although she admitted that things were "fuzzy" because she had taken Percocet, she testified to seeing Hodkiewicz in the mirror before she lost consciousness. Hodkiewicz yet again denied committing the assault and said that he was at his parents' house with J. that night.

In addition to the above evidence, Hendzel testified that Hodkiewicz admitted to joking to coworkers that he would be better off if S.P. were "underground." Specifically, when asked if Hodkiewicz "indicated that he would be better off if [S.P.] were underground," Hendzel replied, "He stated that he may have said that to coworkers." And when asked, "It wasn't that other people said it and he heard it. It was that he said it?" Hendzel replied, "Correct." Hendzel also testified that Hodkiewicz originally denied making the statement before admitting to saying it as a joke.

In the end, the jury convicted Hodkiewicz on all counts, and the court sentenced him to eight years' imprisonment and thirteen years' extended supervision. Afterward, Hodkiewicz filed postconviction motions in which he raised due-process, right-to-confrontation, and ineffective-assistance claims. The

Wisconsin trial court denied the motions on January 29, 2016, holding (among other things) that Hodkiewicz failed to prove that his trial attorney was ineffective in any respect.

Hodkiewicz appealed, and in a thorough opinion, the Wisconsin Court of Appeals reversed his convictions on Counts 2 and 3 (unlawful use of a telephone and disorderly conduct) "because his trial attorney was ineffective by failing to object to hearsay testimony that S.P. received [the August 10, 2012] phone call on her work phone." The court affirmed his remaining convictions, however, and the Wisconsin Supreme Court denied review.

Hodkiewicz then petitioned the federal district court for a writ of habeas corpus. The district court denied habeas relief and granted Hodkiewicz a certificate of appealability, but only with respect to his ineffective-assistance claim; his other claims were procedurally defaulted. We denied Hodkiewicz's request to expand the certificate of appealability. Thus—despite his obvious attempts to sneak his various other arguments into this appeal—we address only Hodkiewicz's ineffective-assistance claim.

## II. Analysis

We review the decision of the district court *de novo*. *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (citing *Freeman v. Pierce*, 878 F.3d 580, 585 (7th Cir. 2017)). But because the Wisconsin Court of Appeals addressed the merits of Hodkiewicz's claim of ineffective assistance of counsel, we apply to that decision the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d)(1). *Id.* Under AEDPA, Hodkiewicz must show that the decision of the Wisconsin Court of

Appeals "(1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* at 476–77 (quoting 28 U.S.C. § 2254(d)).

The Supreme Court has gone to great lengths to explain just how "difficult to meet" this standard is. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). We "simply review[] the specific reasons given by the state court and defer[] to those reasons if they are reasonable." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). Put another way, Hodkiewicz must show that the state court's decision was "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102).

Hodkiewicz argues that the Wisconsin Court of Appeals unreasonably applied *Strickland v. Washington*, 466 U.S. 668 (1984), when ruling on his ineffective-assistance claim. To succeed under *Strickland*, Hodkiewicz must show that (1) his counsel's performance fell below "an objective standard of reasonableness" (the deficient-performance prong) and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (the prejudice prong). *Id.* at 688, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The deferential nature of the *Strickland* standard, combined with the deference owed state-court decisions under § 2254(d), means that our review is 'doubly deferential.'"

*Bryant v. Brown*, 873 F.3d 988, 996 (7th Cir. 2017) (quoting *Hinesley v. Knight*, 837 F.3d 721, 732 (7th Cir. 2016)). And because "[t]he *Strickland* standard is a general one, … the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).[2]

Hodkiewicz contends that his attorney was ineffective in failing to:

1. Object to Hendzel's hearsay testimony that "technical support with TracFone" told him a TracFone can be activated with a "secondary" telephone number—*i.e.*, activated remotely;

2. Object to Hendzel's hearsay testimony that he had "received information" that Hodkiewicz had relatives working at the jail suspected of providing him with "special privileges," including "getting out of his jail cell and having access to phones";

3. Object to or rebut Hendzel's hearsay testimony that S.P. said she received the August 10, 2012 call "on her work phone";

---

[2] Hodkiewicz argues for *de novo* review of the Wisconsin Court of Appeals's decision on the basis that the court employed the wrong prejudice standard. *See Thomas v. Clements*, 789 F.3d 760, 767 (7th Cir. 2015) (reviewing *de novo* where the state court erroneously applied a "*would have led* to a different result" prejudice standard). We disagree. The court recited, in full, the correct standard from *Strickland* and applied that standard throughout its opinion. To the extent the court ever strayed from that language, "it is more likely that the court stated its conclusion imprecisely than that it applied a different standard." *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006). "We therefore evaluate the state appellate court decision under the deferential standard set forth in AEDPA." *Sussman v. Jenkins*, 636 F.3d 329, 360 (7th Cir. 2011).

4. Rebut Hendzel's "false" testimony that Hodkiewicz personally admitted to joking that he would be better off if S.P. were "underground"; and

5. Rebut Wudtke's "misleading" testimony offered to undermine Hodkiewicz's alibi witness, Thorson.

The Wisconsin Court of Appeals held that these alleged errors, even if instances of deficient performance under *Strickland*, did not individually or cumulatively prejudice Hodkiewicz. As we now explain, this was a reasonable conclusion.

First, with respect to the testimony about how a TracFone can be activated, the Wisconsin Court of Appeals focused on the "strong evidence connecting Hodkiewicz to the harassing phone calls made to S.P." and concluded that, "even without Hendzel's testimony, the jury could have reasonably inferred that Hodkiewicz had a coworker activate the TracFone for him." That evidence included the facts that (1) the TracFone made no calls to anyone other than S.P.; (2) S.P. testified to recognizing Hodkiewicz's voice; (3) the two were in the midst of a contentious divorce and child-custody battle and "there was no evidence presented to indicate that anyone other than Hodkiewicz had a motive to harass S.P."; and (4) Hodkiewicz's employer allowed its employees to use its telephone while at work. "Under these circumstances," the court concluded, "it is not reasonably probable the result of Hodkiewicz's trial would have been different had his trial counsel objected to Hendzel's testimony" about what he had heard from TracFone personnel.

This was an eminently reasonable application of *Strickland*, and we agree with the district court's conclusion that "[t]he prosecution portrayed Hodkiewicz as a careful

manipulator who skillfully evaded detection, and the jury ev-
idently believed it. It seems unlikely, then, that uncertainty
about how Hodkiewicz activated a TracFone from jail would
have planted serious doubt in the jury's mind that Hodkie-
wicz used the TracFone to harass S.P."

Second, regarding the testimony about Hodkiewicz re-
ceiving "special privileges" in jail, the Court of Appeals
pointed to the defense's cross-examination of Hendzel, dur-
ing which he admitted that it would have been a "criminal
act" for any jail employee to provide Hodkiewicz with special
treatment; that he had not investigated whether Hodkiewicz
had received special treatment; and that he had no personal
knowledge of whether Hodkiewicz accessed a phone in jail.
Hodkiewicz, for his part, denied that he had phone access,
and his lawyer emphasized the lack of evidence about such
special privileges in closing argument. Thus, the court reason-
ably determined that "Hodkiewicz significantly undermined
Hendzel's testimony that Hodkiewicz received special privi-
leges, including phone access, while in jail," and an added
hearsay objection is not reasonably probable to have some-
how tipped the scales toward a different result.

In addition, the Court of Appeals noted that none of the
charges against Hodkiewicz hinged on a finding that he per-
sonally activated the TracFone or placed the seventeen calls
made while he was in custody. Count 1 and "Counts 4
through 9 were unrelated to any phone calls S.P. received,"
and Counts 2 and 3 concerned the flowers left at S.P.'s apart-
ment and the call made on August 10, 2012, when Hodkiewicz
was not in custody. So it is not reasonably probable that the
jury's verdict on any of these counts would have been differ-
ent had counsel objected to the "special privileges" hearsay.

Third, the Court of Appeals determined that counsel's failure to object to or rebut Hendzel's testimony that S.P. said she received the August 10, 2012 call "on her work phone" did not cause prejudice with respect to the Counts 1 and Counts 4 through 9—the counts at issue in this appeal—because "none [of those charges] required proof that Hodkiewicz placed the August 10, 2012 call to S.P." Hodkiewicz now argues that that conclusion was unreasonable because, if counsel had rebutted Hendzel's testimony, it would have undermined S.P.'s claim that she recognized Hodkiewicz's voice on the other calls she received, too—and therefore shattered her credibility.

This argument appears to have been forfeited. The Court of Appeals noted that "Hodkiewicz does not dispute the State's assertion that counsel's error in failing to object to Hendzel's testimony regarding the August 10 call did not affect the jury's verdicts on Count 1 and Counts 4 through 9." As we have explained, "[i]f a petitioner fails to raise an issue in state court proceedings, he cannot raise it for the first time in a federal habeas corpus petition." *Sotelo v. Ind. State Prison*, 850 F.2d 1244, 1252 (7th Cir. 1988) (citing *Washington v. Lane*, 840 F.2d 443, 445 (7th Cir. 1988)).

In any event, we agree with the district court that Hodkiewicz's argument is unpersuasive. As that court explained, the jury heard from thirty-five witnesses—the defendant, the victim, medical professionals, a domestic violence counselor, probation officers, and others—and had ample evidence on which to base a determination of S.P.'s credibility. Therefore, "it was reasonable for the court of appeals to conclude that … there is not a reasonable likelihood that counsel's objection to this one piece of testimony would have so changed

the jury's credibility determination that they would have acquitted Hodkiewicz on [these] counts."

Fourth, the Court of Appeals determined that counsel's failure to rebut Hendzel's "false" testimony that Hodkiewicz personally admitted to joking that he would be better off with S.P. "underground" did not cause prejudice.

We need not take any position on whether this testimony was false because we conclude, like the district court, that the Court of Appeals reasonably determined that counsel's alleged error did not cause prejudice. Whether Hodkiewicz himself made the statement in jest or—as Hodkiewicz contends—his coworkers made the statement in jest ultimately would have made little difference considering the evidence as a whole. The jury was faced with testimony that Hodkiewicz brutally strangled S.P. in her home, for example, and the evidence of their divorce and custody dispute provided clear motive. It is not reasonably probable that the jury would have rendered a different verdict had it learned that Hodkiewicz did not actually make the joke that Hendzel attributed to him.

Fifth, the Court of Appeals determined that counsel's failure to rebut Wudtke's "misleading" testimony undermining Hodkiewicz's alibi witness, Thorson, was not prejudicial. Hodkiewicz contends that his lawyer should have introduced or relied on prior statements that he and Thorson gave to the police a few days after the incident, which supposedly confirmed that Thorson was with Hodkiewicz on December 9. Specifically, Hodkiewicz told police (not Wudtke) that "Kyle Thorson had observed me in my garage. Kyle text messaged me earlier in the night [and] came over later." And Thorson told police (not Wudtke) that he "observed the exterior lights on" at Hodkiewicz's home between 7:00 and 7:30 p.m.;

"observed the light on" in Hodkiewicz's garage at about 9:00 p.m., and "went over to visit" Hodkiewicz at about 10:00 p.m.

The Court of Appeals was not persuaded and concluded that "[i]t is not reasonably probable the result of Hodkiewicz's trial would have been different had his trial attorney introduced these statements, which do not provide anything remotely resembling an ironclad alibi." Even if these prior statements were used at trial, the jury reasonably could have concluded that Hodkiewicz left his home between 7:00 and 7:30 p.m. (when Thorson saw his exterior lights turn on) and returned around 9:00 p.m. (when Thorson saw his garage light turn on). That leaves at least a one-and-a-half-hour window during which Thorson did not have eyes on Hodkiewicz and in which Hodkiewicz could have committed the assault.

What's more, the defense's use of these prior statements would have *impeached* Thorson's trial testimony that he went over to speak with Hodkiewicz at around 8:00 or 8:30 p.m. It is therefore not reasonably probable that the jury would have reached a different result on any of the charges had the defense introduced these prior statements and discredited its own alibi witness in the process.

Thus was the Court of Appeals's analysis, and we find it a reasonable application of *Strickland*.

Finally, Hodkiewicz's last argument is that even if none of the above purported errors was prejudicial in isolation, counsel's performance was prejudicially deficient when one considers their cumulative effect.

To be sure, "[w]e previously have pointed out that prejudice may be based on the cumulative effect of multiple errors." *Hough v. Anderson*, 272 F.3d 878, 891 n.3 (7th Cir. 2001).

But the Court of Appeals rejected this argument, concluding that the asserted errors, "whether considered individually or together, do not convince us [that Hodkiewicz] is entitled to a new trial on the remaining seven counts."

We, like the district court, think this conclusion was "one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 749 (7th Cir. 1997). While the trial ultimately came down to a contest of credibility, as the district court explained, "the evidence of credibility was voluminous," and the jury is not reasonably probable to have reached a different verdict "[e]ven if counsel might have somewhat undermined S.P.'s credibility or the state's case by doing everything Hodkiewicz suggests he should have." Thus, "[e]ven when viewed cumulatively, the alleged errors in the defense attorney's performance did not so influence the proceedings to suggest that 'but for the counsel's unprofessional errors, the result of the proceeding would have been different.'" *United States v. Jackson*, 983 F.2d 757, 762 (7th Cir. 1993) (quoting *Strickland*, 466 U.S. at 694).

Ultimately, even if the jury *conceivably* could have decided differently if counsel performed as Hodkiewicz wishes he had, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112. Fairminded jurists could agree with the Wisconsin Court of Appeals that, given all the evidence presented at trial, Hodkiewicz failed to meet this standard.

### III. CONCLUSION

We AFFIRM the district court's denial of Hodkiewicz's petition for a writ of habeas corpus.